UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>)<br>AUSTIN MANSUR )  | 17 CR 643-5<br><br>Honorable Matthew F. Kennelly |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for Norther District of Illinois, submits this sentencing memorandum concerning defendant Austin Mansur. For the reasons set forth below, the government respectfully requests that this Court sentence defendant to a sentence of imprisonment within the advisory Sentencing Guidelines range of 12 to 18 months' imprisonment.

**I.    Offense Conduct**

Beginning in February 2015, defendant Austin Mansur and eight co-defendants participated in a conspiracy to engage in insider trading in the publicly traded stock and stock options of Life Time Fitness, Inc.[1]

Specifically, on or about February 24, 2015, defendant learned material, non-public information about Life Time Fitness, Inc. from his long-time friend, co-defendant Peter Kourtis. ECF Doc. No. 221 (Defendant's Plea Agreement) at ¶ 6. Namely, Kourtis told defendant that Life Time Fitness, Inc. would be acquired by

---

[1] The summary of the offense conduct is based on the facts in the Government's Version of the Offense, the factual basis in the plea agreement, and the facts included in paragraphs 9 to 17 of the Presentencing Investigation Report ("PSR").

another company in short order, and the sale would cause Life Time Fitness, Inc.'s share price to increase to at least $67 per share. *Id.* Kourtis explained to defendant that the nonpublic information about the imminent acquisition of Life Time Fitness came from Kourtis' friend, co-defendant Bret Beshey. *Id.* Defendant had met Beshey previously through Kourtis. *Id.* Based on his discussions with Kourtis, including the specificity of the information, defendant understood that the information about Life Time Fitness had ultimately come from an insider who was friends with Beshey and had improperly disclosed the inside information about Life Time Fitness' upcoming acquisition to Beshey in breach of duties of trust and loyalty that the insider owed to Life Time Fitness and its shareholders. *Id.* Indeed, based on his conversations with Kourtis, defendant understood that the Life Time Fitness insider had not disclosed the information for a legitimate corporate purpose, but instead the Life Time Fitness insider had disclosed the information for the benefit of himself and Beshey. *Id.*

Defendant and Kourtis agreed that defendant would contact Individual A, a co-worker of defendant's at Company A, for the purpose of getting information on how best to use the material, nonpublic information about Life Time Fitness. Gov. Version Ex. A (Kourtis Grand Jury Statement) at 4; ECF Doc. No. 4 (Beshey Plea Agreement) at 4. During the conversation, defendant told Individual A that he was interested in Life Time Fitness securities and asked Individual A questions about stock options. Individual A provided information to defendant, but Individual A did not know Defendant was asking for the information so that he (defendant), Kourtis and others could use the information to profit through insider trading. *Id.*; Gov. Version Ex. B

2

(FBI Report of Interview of Individual A); see also Govt. Sentencing Memo Ex. A.

Between on or about February 26, 2015 and on or about March 5, 2015, defendant, while in possession of the material, nonpublic information, used approximately $30,841 in a securities brokerage account held in his name at Fidelity Investments to purchase approximately 465 out-of-the-money Life Time Fitness stock options and 250 shares of Life Time Fitness stock. ECF Doc. No. 221 (Defendant's Plea Agreement) at ¶ 6. Specifically, defendant used approximately $15,853 to purchase approximately 465 Life Time stock options and approximately $14,977 to purchase approximately 250 shares of Life Time stock. *Id.* The call options had expiration dates of March 20, 2015 and April 17, 2015 and strike prices of $60, $65, and $70 per share. *Id.*

When the New York Stock Exchange closed on March 5, 2015, Life Time Fitness' share price was $57.67. *Id.* After the close of trading on March 5, 2015, the Wall Street Journal published an article reporting that Life Time Fitness was in advanced discussions to sell all of the company's outstanding shares to one of two private equity firms. *Id.* On March 6, 2015, Life Time Fitness, Inc.'s share price increased to a high of $69.13. *Id.* On or about the morning of March 16, 2015, Life Time Fitness, Inc. issued a press release announcing that two private equity firms were purchasing all of the company's shares for $72.10 per share. *Id.*

Beginning on or about March 6, 2015, when the news became public that two private equity firms were purchasing all of Life Time Fitness' shares, the Life Time Fitness share price increased and defendant began selling the Life Time Fitness

3

securities he had purchased. *Id.* Defendant sold the securities for a total of approximately $164,167 and his total insider trading profits totaled $133,326. Defendant told Kourtis that his total profits from the Life Time Fitness securities were less than $25,000. *Id.* In or about April 2015, defendant paid Kourtis a kickback for the inside information of approximately $1,000 in cash. *Id.*

## II.   The Advisory Sentencing Guidelines Range

The government's position is that defendant's advisory Sentencing Guidelines range is 12 to 18 months' imprisonment. The advisory Sentencing Guidelines range is based on a base offense level of eight under Guideline § 2B1.4(a) and an eight-level enhancement under Guidelines §§ 2B1.4(b)(1) and 2B1.1(b)(1)(E), because defendant's gain from the offense was $133,326, which was more than $95,000 but less than $150,000. Defendant has clearly accepted personal responsibility for his criminal conduct and, under Guideline § 3E1.1(a), a two-level reduction in the offense level is appropriate. Further, defendant's Guidelines are calculated based on a criminal history that includes zero criminal history points and his criminal history category is I.

## III.   Application of the § 3553(a) Factors

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. The relevant § 3553(a) factors in this case include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need to reflect the seriousness of the offense, to promote

respect for the law, to afford adequate deterrence, and to provide just punishment for the offense; and (4) the need for restitution. The government submits that these factors weigh in favor of a Guideline range sentence.

### A. The Nature and Circumstances of Defendant's Offense Weigh in Favor of a Guidelines Sentence

Defendant's actions weigh in favor of a sentence within the advisory Guidelines range. Insider trading undermines confidence in the integrity of the financial markets, disadvantages ordinary investors who follow the rules, and violates the confidence of companies whose information is misappropriated. Because it is a serious crime with damaging effects, insider trading calls for a substantial sentence. *See United States v. O'Hagan*, 521 U.S. 642, 659 (1997) (noting the "inhibiting impact on market participation of trading on misappropriated information"); *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (stating an insider trading defendant's "corrosive influence on the integrity of the financial markets and on the expectation of trust and confidence ... required a significant punishment" and affirming a 120-month sentence).

The defendant's participation in the insider trading conspiracy in this case was a significant crime, and his insider trading was not a momentary lapse in judgment that resulted in a single trade. Rather, between February 27, 2015 and continuing through March 5, 2015, defendant repeatedly purchased Life Time Fitness securities using material, nonpublic information that he knew had been stolen by an insider at Life Time Fitness and tipped to a friend for no legitimate corporate purpose,

5

so the insider's friend could trade and profit. Each time defendant traded, he made a conscious, deliberate choice to violate the law. As a result, the considerations of 18 U.S.C. § 3553(a)(2)(A) warrant a Guideline sentence.

Defendant suggests that his role in the offense was minimal compared to other defendants, but the primary goal of the conspiracy was to profit through insider trading, and defendant's insider trading profits exceeded all but one of his co-defendants. Below is a chart summarizing the approximate insider trading profits for defendant and his five co-defendants who traded in late February and early March 2015 using the material, nonpublic information about Life Time Fitness:

| Trader | First Purchase | Sales Started | # of Contracts | Call Expiration | Strike Price | Total Purchase Price | Total Sales Proceeds | Profit |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Weller | 2/25/2015 | 3/6/2015 | 1,010 | 3/20 | 60, 65, 70 | $54,349.38 | $609,127.19 | $554,777.81 |
| Mansur | 2/26/2015 | 3/6/2015 | 465 | 3/20 & 4/17 | 60, 65, 70 | $30,841.44 | $164,167.45 | $133,326.01 |
| Kourtis | 2/25/2015 | 3/6/2015 | 300 | 3/20 | 65 | $10,427.70 | $103,171.44 | $92,743.74 |
| Kandalepas | 3/3/2015 | 3/6/2015 | 140 | 3/20 | 65 | $2,918.35 | $40,530.91 | $37,612.56 |
| Bonvissuto | 2/25/2015 | 3/6/2015 | 144 | 3/20 | 65 | $5,296.00 | $38,973.11 | $33,677.11 |
| Carlucci | 3/2/2015 | 3/6/2015 | 40 | 3/20 | 60, 65 | $2,023.63 | $16,515.27 | $14,491.64 |
|  |  |  |  |  |  |  |  | **Total Profit: $866,628.87** |

The amount of money a defendant profits through fraud speaks in a meaningful way to the wrongfulness of the conduct. A defendant who, like defendant, receives fraud profits totaling $133,326 has simply committed a greater transgression than someone who perpetrates a crime that reaps profits totaling $14,491, $37,677, or $33,612, just as a thief who steals diamonds bears more culpability than a shoplifter who steals a candy bar. Further, the $133,326 in insider trading profits that the defendant

6

received did not appear out of thin air. Indeed, most of defendant's $133,326 in illegal trading profits came from victims who were on the other side of the Life Time Fitness options contracts—victims who, unlike defendant, did not have access to material, nonpublic information that had been stolen by a Life Time Fitness insider.

In addition to profiting approximately *four times more* than co-defendants Kandalepas and Bonvissuto and approximately *nine times more* than co-defendant Carlucci, defendant's situation differs from those co-defendants in another monumental respect: unlike the defendant, co-defendants Kandalepas, Bonvissuto, and Carlucci each cooperated with the government's investigation, and they each testified in the grand jury prior to indictment. The substantial difference in profits and early cooperation place them in a different category than defendant. Moreover, co-defendant Kourtis, who played a significant role in the conspiracy but profited less than the defendant ($103,171), cooperated pre-indictment and pled guilty pursuant to a cooperation agreement. Yet the government's anticipated sentencing recommendation under that plea agreement is 18 months' imprisonment. Defendant's Guidelines reflect his profits from the insider trading conspiracy and take into account his acceptance of responsibility. In short, the defendant did not have a minor role in the offense, and the government respectfully submits that the Court should impose a sentence of 12 to 18 months' imprisonment, as called for by the advisory Sentencing Guidelines.

Defendant's argument regarding the collateral consequences of his conviction also does not support his requested sentence. ECF Doc. 272 at 12. The collateral

7

consequences identified in defendant's sentencing memo and the letters attached to his sentencing memo, including damage to his reputation and civil actions in which he was ordered to repay his insider trading profits, do not support a sentence of probation that would be a 100% deviation from the advisory Guidelines. The collateral consequences defendant describes are similar to those faced by every white-collar defendant and do not serve as an individualized mitigating factor related to defendant that is entitled to substantial weight. If these consequences were given significant weight in every case, no white-collar defendant would serve jail time. That is directly contrary to policy statements in the Guidelines about how white-collar defendants should be treated. *See* Guideline Chapter 1 Part A, introductory comment 4(d).[2]

### B. Defendant's History and Characteristics Further Weigh in Favor of a Sentence in the Advisory Guidelines Range

The PSR sets forth in detail defendant's history and characteristics, including aspects of defendant's employment, his childhood, and his relationship with family

---

[2] Guidelines Chapter 1, Part A, introductory comment 4(d) provides, in part, as follows:

> Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are "serious."
>
> The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation previously was frequently given and provide for at least a short period of imprisonment in such cases. The Commission concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.

8

and friends. But nothing in the PSR begins to explain why defendant chose to engage in illegal trading.

At the time of the offense, defendant was an executive vice president at Company A, a position that paid him approximately $20,000 *per month*. PSR at ¶¶ 70 and 81. Also, defendant's current total net worth exceeds $3.8 million. PSR at ¶ 73. All of this points to the inescapable conclusion that there was absolutely no reason, financial or otherwise, for defendant to engage in insider trading, other than greed and an arrogant belief that he would not be caught. That is an aggravating factor the Court should consider. *See, e.g., United States v. Anderson,* 517 F.3d 953, 966 (7th Cir. 2008) (noting that district court considered that "[w]hile many criminals commit crimes from lack of opportunity and desperation, [defendant] acted out of greed.").

There is also substantial mitigation. The defendant is a college graduate with no prior criminal history and strong ties to family and friends, as evidenced by the numerous letters offered on his behalf. The defendant has also accepted responsibility for his actions. The Court should consider these mitigating facts in imposing a reasonable sentence, but must weigh them against the seriousness of this crime and other aspects of defendant's history and characteristics.

### C. A Sentence in the Advisory Guidelines Range Will Provide Adequate Deterrence to Others

The need to afford adequate deterrence to others is a critical part of the sentence to be imposed in this case for a number of reasons. First and foremost,

defendant is the exact type of defendant and committed the exact type of crime where general deterrence matters. Insider trading is a crime most often committed by affluent and well-educated defendants. In this case, as in most insider trading cases, it was not a crime of need or passion. Crimes of this nature can be deterred with punishment that includes meaningful terms of incarceration. Other would-be defendants who are thinking about profiting by using material, non-public information will think twice if they believe their actions will have serious consequences. These consequences cannot be simply financial inconveniences such as disgorgement of ill-gotten gains or the payment of fines. Instead, the consequences need to include depriving wrongdoers of their liberty to be effective in deterring others.

Similarly, insider trading cases can be difficult to detect and prove, and lucrative to the participants. Thus, it is important that sentences in this and other fraud cases serve to deter individuals from committing the same crime. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("[I]nsider trading is an easy crime to commit but a difficult crime to detect. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). Here, while it is unlikely that defendant will engage in insider

10

trading again in the future, general deterrence—together with the other 3553 factors—requires a Guidelines sentence.

### D. The Need to Avoid Unwarranted Sentencing Disparities

Under 18 U.S.C. § 3553(a)(6), the Court is to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. To the extent the Court believes that avoiding unwarranted sentencing disparities under § 3553(a)(6) is a factor entitled to significant weight, then it should impose a Guidelines sentence. *See, e.g.*, *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.").

In his sentencing memorandum, defendant argues that his requested sentence of probation is consistent with insider trading sentences imposed in other districts. ECF Doc. 272 at 10. However, it is impossible to tell from the information provided whether defendant's case is really comparable to the ones set forth in defendant's sentencing memorandum. For example, in one of the cases cited by defendant— *United States v. Watson*, No. 15-cr-10210-NMG-1 (D. Mass. Nov. 29, 2016)—the government filed a motion for a downward departure (ECF Docs. 20-26), and the sentencing memoranda filed by both the defendant and the government were filed under seal, suggesting that the sentence may have stemmed from the defendant's substantial cooperation. That is different from the defendant in this case. Although the defendant accepted responsibility for his conduct and pled guilty, he did not

cooperate with the government's investigation.

In contrast to the cases from other districts cited by defendant, a review of the last four insider trading cases in this district suggest that a Guidelines sentence is appropriate in this case.

In *United States v. Napadano*, Judge Dow sentenced Napadano, a financial analyst, to 4 months' imprisonment. (17 CR 633, Docket # 25). Napadano's insider trading profits were $143,000. Therefore, just as in this case, the Napadano's Guidelines were 12 to 18 months' imprisonment.

In the *United States v. Basrai*, the defendant received a sentence of 2 years' probation from Judge Durkin. (17 CR 634, Docket #19.) He is not, however, similarly situated to defendant. Basrai engaged in insider trading and made approximately $37,157. (*Id.* at Docket #10, pg. 9.) He also received a 5-K motion from the government based on substantial assistance he provided. (*Id.* at pg. 11-12.) By contrast, defendant made substantially more money and is not receiving a 5-K.

In *United States v. Dombroski*, Judge Ellis sentenced the defendant to one year and one day of imprisonment. (14 CR 41, Docket #50.) The defendant in that case made $286,211 by shorting stock and purchasing put options of the company for which he worked in advance of a negative earnings announcement. (*Id.* at Docket #28.) The defendant pled guilty pursuant to a plea agreement with the government, but did not receive a 5-K motion. (*Id.*) His Guidelines range, at least as reflected in his plea agreement, was 24 to 30 months' imprisonment. (*Id.* at pg. 9.)

Finally, in *United States v. Flanagan*, Judge Dow sentenced the defendant to

21 months' imprisonment. (12 CR 510, Docket #17.) The defendant in that case was a partner at a large accounting firm. As part of his position, Flanagan obtained inside information about some of the accounting firm's clients, and he used that information to purchase and sell stock. (*Id.*) He repeatedly engaged in insider trading and made profits totaling approximately $478,000. (*Id.*) Flanagan pled guilty and agreed to be charged via an information. (*Id.*) His Guidelines range, at least as set forth in the plea agreement, was 37 to 46 months' imprisonment. (*Id.* at pg. 21.)

While it is difficult to truly compare defendants because each case and each defendant presents factors that are different and that are not necessarily reflected in the materials available in the public record, the sentences imposed in these cases from this district are insightful. The message sent by these cases is that, with the exception of cases in which insider trading defendants cooperate and provide substantial assistance during the government's investigation, insider trading is a serious crime that requires substantial general deterrence in the form of some term of imprisonment.

For all of these reasons, the government submits that a sentence within the Sentencing Guidelines would be consistent with the factors set forth in 18 U.S.C. § 3553(a) and would be sufficient, but not more than necessary, to achieve the goals of sentencing.

## IV. The Court Should Impose Conditions of Supervised Release

The government agrees with Probation's recommendation that a term of

Supervised Release is not appropriate in this case.

## V. Conclusion

For the reasons set forth above, the government respectfully requests that this Court impose a sentence within the advisory Sentencing Guidelines.

          Respectfully submitted,

          JOHN R. LAUSCH, JR.
          United States Attorney

          By: */s/ John D. Mitchell*
          JOHN D. MITCHELL
          Assistant United States Attorney
          219 S. Dearborn Street, 5th Floor
          Chicago, Illinois 60604
          (312) 353-5159